**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**

Civil Action No.:

TRAVIS COLE,

      Plaintiff,

v.

BOULDER COUNTY, COLORADO;
SHERIFF JOE PELLE, in his individual and official capacity;
COMMANDER LYDIA MITCHELL, in her individual and official capacities;
COMMANDER GENO MARTINEZ, in his individual and official capacities;
SERGEANT CHRISTOPHER MECCA, in his individual and official capacities;
DEPUTY CLAYTON DOMANICO, in his individual and official capacities;
DEPUTY JOHN FINKBINER, in his individual and official capacities;
DEPUTY AMMIE HOWLAN, in her individual and official;
DEPUTY JOEL FUNDARO, in his individual and official capacities;
DEPUTY SEAN METCALF, in his individual and official capacities;
DEPUTY JEREMY MCDANIEL, in his individual and official capacities;
DEPUTY JAMES LONG, in his individual and official capacities;

      Defendants.

_____

**COMPLAINT AND JURY DEMAND**
_____

      Plaintiff Travis Cole, by and through counsel, Mari Newman and Andy McNulty of

KILLMER, LANE & NEWMAN, LLP, alleges for his Complaint and Jury Demand as follows:

**<u>INTRODUCTION</u>**

      1.      Plaintiff Travis Cole was fully restrained when he was brutally tased by Boulder

County Sergeant Chris Mecca. Despite the fact that Mr. Cole presented no threat whatsoever,

multiple other Boulder County deputies looked on and did nothing to intervene to stop their

sergeant from sadistically punishing a fully-restrained person without any legitimate penological

justification. Mr. Cole's tasing was not an aberration within the Boulder County Jail ("BCJ") or

within the behavior of Defendant Mecca. This Boulder County sergeant's tasing of a person who was fully restrained came on the heels of Boulder County Sheriffs tasing Lauren Gotthelf (who was also fully restrained), demonstrating BJC's disturbing custom and practice of aggressive punishment of inmates through restrained tasings. And, Defendant Mecca was particularly known for his propensity for escalating situations with inmates, and BCJ command staff was aware that he had openly complained when it was announced in the BCJ that Boulder County had settled Ms. Gotthelf's legal claims for the *exact same* misconduct, paying Ms. Gotthelf $400,000. Defendants' unconstitutional tasing of Mr. Cole was far from unpredictable: Defendant Mecca acted just as Boulder County expected him to act based on both his vocal opposition to the Gotthelf settlement that very day, and Boulder's repeated condoning of his repeated unconstitutional conduct in the past. Boulder County knew, based on his past behavior, that Defendant Mecca was a ticking timebomb. Defendant Mecca's supervisors were unsurprised when they learned he had brutalized Plaintiff.

2.     Because of this, not only is Defendant Mecca liable, but so are the officials who stood by and watched him tase Plaintiff, the supervisors who knew that Defendant Mecca had a repeated history of escalating situations and using excessive force but did not take any formal action to prevent him from continuing to do so, and Boulder County itself for allowing Defendant Mecca to work in a supervisory role despite his repeated failures to follow policy and accept counseling from his superiors, along with his frequent and vocal defiance of policy and procedure.

3.     Defendants' abuse of Plaintiff was a clear and grave injustice for which Defendant Mecca, Boulder County, and all of the officials involved in Plaintiff's tasing must take full accountability.

## JURISDICTION AND VENUE

4.      This action arises under the Constitution and laws of the United States and the State of Colorado and is brought pursuant to Title 42 U.S.C. § 1983, 42 U.S.C. § 12132, *et seq.*, and 29 U.S. § 701, *et seq.*

5.      Jurisdiction is conferred on this Court pursuant to 28 U.S.C. § 1331.

6.      Jurisdiction supporting Plaintiff's claim for attorneys' fees and costs is conferred by 42 U.S.C. § 1988 and C.R.S. § 13-21-131.

7.      Venue is proper in the District of Colorado pursuant to 28 U.S.C. § 1391(b). All of the events alleged herein occurred within the State of Colorado, and all of the parties were residents of the State at the time of the events giving rise to this litigation.

8.      Supplemental pendent jurisdiction is based on 28 U.S.C. § 1367 because the violations of federal law alleged are substantial and the pendent causes of action derive from a common nucleus of operative facts.

## PARTIES

9.      Plaintiff, Travis Cole, is a citizen of the United States and was at all relevant times a resident of and domiciled in the State of Colorado.

10.      Boulder County is a governmental entity chartered under the laws of the State of Colorado. Among other things, Boulder County operates the Boulder County Jail ("the Jail" or "BCJ"), located at 3200 Airport Road in Boulder, Colorado.

11.      At all times relevant to this Complaint, Defendant Sheriff Joe Pelle was a citizen of the United States, resident of and domiciled in the State of Colorado and was acting under color of state law in his capacity as the Boulder County Sheriff. Defendant Pelle in his official capacity, is a final policymaker for Boulder County with respect to all matters concerning the

Boulder County Sheriff's Office and all of its divisions, including the BCJ. Defendant Pelle was responsible for training and supervising all other Defendants and other employees of Boulder County working at the jail, for setting jail policy for the county, the overall management of the jail, and for insuring the health and welfare of all persons detained in the BCJ.

12.     At all times relevant to this Complaint, Defendants Commander Lydia Mitchell, Commander Geno Martinez, Sergeant Christopher Mecca, Defendant Clayton Domanico, Defendant John Finkbiner, Defendant Ammie Howlan, Defendant Joel Fundaro, Defendant Sean Metcalf, Defendant Jeremy McDaniel, and Defendant James Long, respectively, were each a citizen of the United States, resident of and domiciled in the State of Colorado and were each acting under color of state law in their respective capacities as law enforcement officers employed by Boulder County.

## FACTUAL ALLEGATIONS

**Boulder County officials subjected Plaintiff to excessive force clearly meant to cruelly punish him at the BCJ.**

13.     Just before midnight on September 22, 2020, officers of the Longmont Police Department arrested Mr. Travis Cole on a handful of misdemeanor charges and delivered him to the Boulder County Jail for booking. Upon arrival at the jail early in the morning of September 23, 2020, the Longmont officers transferred custody and control of Mr. Cole to Boulder County deputies in the jail sally port.

14.     Defendant Clayton Domanico and Defendant John Finkbiner removed Mr. Cole from the Longmont patrol vehicle and walked him to the mat where Boulder County personnel pat down arriving arrestees. As they arrived at the mat, Mr. Cole knelt to the ground, and the deputies decided to move him to a waiting restraint chair, which they accomplished without incident.

4

15.     Numerous Boulder County personnel surrounded Mr. Cole, including at least Defendant Domanico, Defendant Finkbiner, Defendant Ammie Howlan, Defendant Joel Fundaro, Defendant Sean Metcalf, Defendant Jeremy McDaniel, and Defendant James Long, and together they worked to secure Mr. Cole in the chair at the direction of Defendant Mecca.

16.     Mr. Cole offered some mild passive resistance once confronted with the humiliation and discomfort of the restraint chair, including moving his upper body, blowing raspberries at the deputies, and holding a spit mask in his mouth. However, Mr. Cole was heavily outnumbered and outmuscled by the crowd of Defendants, who were able to secure all of Mr. Cole's limbs to the restraint chair in the space of approximately two minutes and ten seconds. As Defendants placed a pair of spit masks over Mr. Cole's head, Mr. Cole began to shout in distress.

17.     At this point, though all four of Mr. Cole's limbs were secured to the restraint chair and deputies had almost secured an additional shoulder strap on him, Defendant Mecca began to verbally taunt the helpless Mr. Cole, seeking to provoke aggression from the fully restrained arrestee by repeatedly challenging him to resist Defendant Mecca and the other Defendants restraining him. Simultaneously, Defendant Mecca placed his taser against Mr. Cole's leg, threatening to drive stun him.

18.     It was obvious to all present that Mr. Cole had been completely restrained in the chair and spit masks, and could not break free from the chair or do anything but sit there with all four points restrained. Further, Mr. Cole was surrounded by at least eight Boulder County deputies, including Defendant Domanico, Defendant Finkbiner, Defendant Howlan, Defendant Fundaro, Defendant Metcalf, Defendant McDaniel, and Defendant Long, as well as two Longmont officers. Mr. Cole obviously lacked the means to resist the so-called "chairing"; he

5

could not use any of his limbs, could not spit, and indeed could not do anything at all beyond yell and shift his shoulders around.

19.     As Defendant Mecca taunted Mr. Cole, held a taser to his leg, and threatened him with activating the taser, Defendant Domanico, Defendant Finkbiner, Defendant Howlan, Defendant Fundaro, Defendant Metcalf, Defendant McDaniel, and Defendant Long watched. Defendant Domanico, Defendant Finkbiner, Defendant Howlan, Defendant Fundaro, Defendant Metcalf, Defendant McDaniel, and Defendant Long all saw Defendant Mecca with his taser out, and against Mr. Cole's leg, yet did nothing to intervene, even though there was no conceivable justification for Defendant Mecca's threat to tase Mr. Cole. Defendant Domanico, Defendant Finkbiner, Defendant Howlan, Defendant Fundaro, Defendant Metcalf, Defendant McDaniel, and Defendant Long did not tell Defendant Mecca to back off, stop speaking with Mr. Cole, re-holster his taser, or take any action to de-escalate the situation (or ensure that Defendant Mecca did not activate his taser and electrocute Mr. Cole, who was clearly fully restrained and not a threat).

20.     Then, while continuing to taunt Mr. Cole, Defendant Mecca activated his taser and electrocuted Mr. Cole, watching his restrained body shake and writhe for approximately five seconds—an act of sheer cowardly sadism with no conceivable legitimate law enforcement or penological purpose, and a certain infliction of excessive force.

21.     Having already exerted unjustified physical force against Mr. Cole, Defendant Mecca subjected Mr. Cole to a variety of further taunts and insults, apparently unsatisfied with the cruelty he had already inflicted.

22.     A few seconds later, Defendant Mecca threatened to follow Mr. Cole to the holding cell for the implied purpose of physically fighting Mr. Cole before again taunting him.

6

Defendant Mecca went so far as to actually follow Mr. Cole as another Defendant wheeled the restraint chair out of the sally port and into a cell, for no purpose other than to make a machismo-fueled proclamation that he wasn't afraid of Mr. Cole. Indeed, one would be surprised to find that a trained sheriff sergeant armed with a taser and a full team of deputies was afraid of a fully restrained, spit mask-bound man with zero agency over his own movement. There was no legitimate law enforcement or penological basis for Defendant Mecca to continue threatening and taunting Mr. Cole.

23.    Defendants left Mr. Cole in the restraint chair, fully restrained and in an isolation cell, for four hours.

24.    Incredibly, Defendant Mecca reported to his superiors in an email after the incident that he had chosen to tase Mr. Cole while he was fully restrained, and not use other methods of applying force, because Mr. Cole is a Black man. Had Plaintiff been White, Defendant Mecca would not have tased him. There was no legitimate law enforcement or penological reason to use a taser against Mr. Cole because he is a Black man.

25.    In contrast with all of the Boulder County deputies who both failed to intervene and went on to express their support of Defendant Mecca's brutality against Mr. Cole, the Longmont Police Department (LPD) officers who witnessed Defendant Mecca's cruel use of excessive force against Mr. Cole were stunned. LPD Officers Jeff Davis and James Guerrero transported Plaintiff to the Boulder County Jail and witnessed the taser usage by Defendant Mecca. Shortly after leaving the jail, the pair of Longmont officers discussed the incident and decided to speak with their own sergeant at LPD regarding their concerns about the taser deployment by Defendant Mecca. Both found Defendant Mecca's use of force to be excessive and extremely concerning. Because of this, they reported it up their chain of command as they

7

believed that they may have had a legal obligation to make such a report. LPD Sergeant Augie Bernal found his officers' reports so concerning that he called Defendant Mecca at the jail to obtain an explanation for Defendant Mecca's use of force, only to find that Defendant Mecca was defensive and offered no valid rationale.

26.     Because of the outcry by LPD Officers, Defendant Mecca would ultimately be fired and prosecuted for his torture of Plaintiff. He was convicted of third-degree assault and official misconduct on December 3, 2020.

27.     As the words and actions of both Defendant Mecca's superiors and subordinates demonstrate, Defendant Mecca's sadistic, unjustified assault on Mr. Cole was emblematic and symptomatic of Boulder County's lax discipline, woefully insufficient supervision, subpar training, and especially of its reckless, dangerous tolerance for a defiant and intemperate employee in a position of lawful authority and ethical responsibility.

**Multiple Boulder County officials failed to intervene to stop the obvious use of excessive force against Mr. Cole by Defendant Mecca.**

28.     Defendants Domanico, Finkbiner, Howlan, Fundaro, Metcalf, McDaniel, and Long participated in the process of strapping Mr. Cole down to the restraint chair. Each of the involved deputies stood within mere feet of the taser when Defendant Mecca first threatened to tase Mr. Cole, when Defendant Mecca actually did tase Mr. Cole, and in the aftermath of the tasing during which Defendant Mecca continued to insult Mr. Cole and threaten to physically assault him. Each of the involved deputies observed Defendant Mecca's threats and ultimate act of sadistic brutality. They stood by as Mr. Cole was left strapped in a restraint chair for four hours.

29.     Yet, *not one* of the involved deputies took any action of any kind to prevent Defendant Mecca's use of excessive force before it happened, or while it happened. Nor did any of the involved deputies take any action to separate Defendant Mecca from Mr. Cole after the use of excessive force in order to prevent further potential abuse, even though Defendant Mecca angrily followed Mr. Cole from the sally port to his cell to continue to threaten and verbally abuse him.

30.     As detailed below, several of the involved deputies would later report to investigators that they believed Defendant Mecca's deployment of the taser against a fully restrained Mr. Cole was appropriate under the circumstances, that they believed that Defendant Mecca's use of force was within Boulder County policy, and that they did know that there was a policy prohibiting Defendant Mecca's actions—but believed that Defendant Mecca's taser application was justified regardless of whether it violated that policy.

31.     Defendant McDaniel reported to investigators after the incident that he had stepped back from the restraint chair during the use of force so that he could better observe what was happening and saw both that the taser was placed against Mr. Cole's leg and that the taser was eventually activated. Defendant McDaniel further stated that he did not know that Boulder County policy forbade the use of a taser as Defendant Mecca applied it.

32.     Similarly, Defendant Long said after the incident that he saw Defendant Mecca use his taser with a drive stun to Mr. Cole's left quad, yet did nothing to intervene. Defendant Long stated after the incident that, in his opinion, the use of the taser against Mr. Cole was absolutely necessary.

33.     Sometime after the use of force against Mr. Cole, Defendant Mecca summoned Defendants Domanico, Finkbiner, Howlan, Fundaro, Metcalf, McDaniel, and Long to a

debriefing. Defendant Mecca commented during that debriefing that he would challenge anyone else to try to restrain Mr. Cole properly without using the taser. Defendant Long described the debrief as positive and noted that Defendants Domanico, Finkbiner, Howlan, Fundaro, Metcalf, McDaniel, and Long decided that it would've been hard to get that individual down without using the taser, thereby affirming Defendant Mecca's decision to tase Mr. Cole. Defendants Domanico, Finkbiner, Howlan, Fundaro, Metcalf, McDaniel, and Long supported the taser use by Defendant Mecca, and that is clear both from their statements after the incident and their action during the incident (failing to intervene to prevent Defendant Mecca's tasing of Mr. Cole).

34.     Defendants' callous and reckless disregard of Mr. Cole's rights stands in stark contrast to the actions of the Longmont Police Department (LPD) officers who witnessed Defendant Mecca's cruel use of excessive force against Plaintiff and reported it.

**Defendant Mecca's supervisors at the BCJ were on notice of Defendant Mecca's inability to control his temper, his express anger and disagreement with the settlement of the *Gotthelf* matter for the exact same conduct, and his frequent defiance toward Boulder County's and Defendant Pelle's policies and procedures long before he tased Mr. Cole.**

35.     As detailed above, not a single involved Defendant made comment as to the illegality of the tasing, much less concern for Mr. Cole's health, well-being, dignity, or rights in the course of the investigation of Defendant Mecca's use of excessive force against Mr. Cole. To the contrary, some made comment that they believed Defendant Mecca had acted in good faith and that they hoped he would not be severely punished for his actions.

36.     Consistent with the training and supervision they had received by Boulder, Defendants Domanico, Finkbiner, Howlan, Fundaro, Metcalf, McDaniel, and Long's attitudes reflected that of Defendant Mecca—that inmate compliance is the paramount goal of detention officers as opposed to treating inmates in a manner consistent with the Constitution or with

respect. They believed Defendant Mecca had acted in good faith and did not believe that he should be punished for his actions under Boulder County's and Defendant Pelle's policies, customs, and practices. They likely believed this because, in the past and in accordance with Boulder County's and Defendant Pelle's unwritten customs and practices, Defendant Mecca (and others) had not been disciplined for engaging in similar excessive uses of force and escalations relating to inmates.

37.     It was also well-known within Boulder County that Defendant Mecca was someone who had a quick temper, escalated situations with inmates, struggled to separate personal frustrations from work performance and took a punitive and forceful approach to the slightest inmate disobedience. Boulder County and Defendant Pelle were well aware of Defendant Mecca's history prior to the incident involving Mr. Cole. Despite this, Boulder County, and its supervisory officials including Defendants Pelle, Mitchell, and Martinez, did not take any action to formally discipline Defendant Mecca to send a message that unconstitutional behavior was not tolerated. Instead, Boulder County and Defendant Pelle promoted Defendant Mecca to a supervisory position. It was because of these actions that, on the night of the incident involving Mr. Cole, Defendant Mecca was the supervisor on-duty and knew that he could escalate the situation with Mr. Cole, and use excessive force, without risk of any formal discipline. The failure of Boulder County and Defendant Pelle to properly supervise and discipline Defendant Mecca caused the violation of Mr. Cole's constitutional rights.

38.     One of Defendant Mecca's former supervisors, Defendant Lydia Mitchell, a commander who supervised Defendant Mecca approximately two and a half years prior to the tasing of Mr. Cole, knew before the incident, and told investigators after the incident, that Defendant Mecca believed the jail should be operated in accordance with his military detention

training rather than as a helping, social work-type environment. She added that Defendant Mecca would like the jail personnel to be more strict and believed that if Boulder County were more strict, that would cause the people in the jail to learn a lesson and become more compliant.

39.     Defendant Mecca's apparent failings as a leader and law enforcement officer were not merely philosophical. Defendant Mitchell told investigators that Defendant Mecca did not accept Boulder County's way of operating a jail, and that he liked to challenge the policies of Boulder County often. Defendant Mitchell further stated that Defendant Mecca failed to accept repeated counseling from her and from his supervisor at the time of the tasing, Defendant Geno Martinez (another commander with Boulder County), regarding his temperament and tactics. She also indicated that she had multiple conversations with Defendant Mecca about his attitude, about the importance of thinking before he acted, and about the responsibilities of a supervisor. Despite this, neither Defendant Mitchell nor Defendant Boulder County ever formally disciplined Defendant Mecca for his repeated problematic conduct, nor did they prevent Defendant Mecca from continuing to interact with inmates.

40.     Defendant Martinez told investigators that he had counseled Defendant Mecca for taunting an uncooperative arrestee within a year of his taunting and tasing of Mr. Cole. Defendant Martinez stated that Defendant Mecca needed to learn how to deal with people—a rather glaring deficiency in a jail sergeant. Despite this, neither Defendant Martinez nor Defendant Boulder County ever formally disciplined Defendant Mecca for his repeated problematic conduct, nor did they prevent Defendant Mecca from continuing to interact with inmates.

41.     Both Defendant Martinez and Defendant Mitchell knew that Defendant Mecca had poor control of his temper. Defendant Mitchell knew that Defendant Mecca had never

12

developed the ability to control himself when confronted by difficult or annoying inmates, a quality that she acknowledged as especially important for supervisors. Defendant Mitchell also knew that Defendant Mecca had always struggled to keep his composure, and to understand how and when to withdraw from a situation in which an inmate caused him to lose his temper.

42.     And demonstrating leadership's awareness that Defendant Mecca was unwilling to follow direction—and Defendant Mecca's knowledge that it was illegal to tase a restrained inmate—Defendant Martinez's final interaction with Defendant Mecca *prior* to the tasing that would lead *Longmont* police officers to report Defendant Mecca's use of excessive force against Mr. Cole consisted of an apparently unsuccessful attempt to calm Defendant Mecca's poorly controlled emotions regarding the very issue of consequences for *tasing a restrained inmate*. In the evening on September 22, 2022, Defendant Martinez met with Defendant Mecca for an unofficial counseling session, during which Defendant Mecca was upset and angered by an email informing him that the county had settled legal claims brought by Lauren Gotthelf[1] who had been tased by a Boulder County official while fully restrained in a restraint chair and as multiple other officials stood by and did nothing. In other words, on the night that he tased Plaintiff while he was fully restrained, Defendant Mecca was incensed about the County's settlement of claims of excessive force by an inmate who was tased in the exact same scenario as Mr. Cole. Defendant Martinez knew this, yet did nothing to prevent Defendant Mecca from continuing to work on the night of September 22, 2022. He did not discipline Defendant Mecca for his unprofessional conduct. Instead, he turned Defendant Mecca loose in the BCJ where he took out his anger about the settlement on Mr. Cole – subjecting him to the very same excessive force that had just cost Boulder taxpayers $400,000 and forced changes in policy and training. Boulder

---

[1] Undersigned counsel also represented Ms. Gotthelf in her suit against Boulder County.

County's and Defendant Pelle's failure to supervise and discipline Defendant Mecca, through Defendant Martinez (or any of his other supervisors), caused the violation of Plaintiff's rights.

43.     Ultimately, despite their extensive knowledge of Defendant Mecca's inability to control his temper, his frequent insistence on a harsh carceral approach, his history of exceedingly poor leadership, and his expressed disagreement over Boulder's decision to take accountability for tasing *another* restrained inmate by settling her legal claims, Defendant Mecca's supervisors at the Boulder County continued to allow him opportunity after opportunity to hold a position of significant responsibility, authority, and power over members of the public until finally he was allowed to commit a criminal assault on Mr. Cole with the support of a crowd of his subordinates. Defendant Mitchell acknowledged that it was well-known within Boulder County, and the BCJ, that Defendant Mecca had been given multiple chances by Boulder County with no formal discipline for behavior that was problematic.

**Boulder County has a history of condoning its officials' use of excessive force, through tasing, against inmates within the BCJ.**

44.     Unfortunately, Mr. Cole's experience is abhorrent, but not aberrant. In addition to the excessive force used against Mr. Cole, Boulder County law enforcement officers have unlawfully used excessive force against other citizens.

45.     In one example of the routine misuse of tasers, resulting in excessive force against inmates within the BCJ by Boulder County officials, on November 25, 2017, Boulder sheriffs handcuffed Lauren Gotthelf behind her back, pinned her to a restraint chair, surrounded her by at least six Boulder County officials, and then subjected her to grossly excessive force. Though Ms. Gotthelf did not resist or threaten the officers in any way, the Boulder County officials repeatedly subjected her to obviously unreasonable force and extreme pain, culminating in one sergeant tasing her despite the fact that she was fully restrained and could not move. There was

no legitimate or penological reason to tase Ms. Gotthelf. The Boulder County officials who tased

Ms. Gotthelf were never disciplined for their actions. Ms. Gotthelf's case is a direct analogue for

Boulder's treatment of Mr. Cole, and predated it by only three years. And, in fact, her case, and

the failure of Boulder County to properly discipline its officials as a result, directly led

Defendant Mecca to brutalize Mr. Cole. Defendant Mecca believed that he would not suffer any

discipline for doing what he did to Mr. Cole, as he was not even disciplined for *become incensed*

*and complaining* about the settlement of Ms. Gotthelf's case. Ms. Gottehelf settled her legal

claims against Boulder County, and its officials, for $400,000.

46.     Additionally, throughout 2016, Boulder County officers at the Boulder County

Jail repeatedly used excessive force against Ryan Partridge. Mr. Partridge is severely mentally

ill, and all the officers at the jail were aware of his condition. Even so, the officers repeatedly

unreasonably tased Mr. Partridge without justification. They did so at least seven times over the

span of just over nine months, and each tasing was accompanied by additional forms of

excessive force from one or more other Boulder County jail officers who was present. On one of

these occasions, Boulder County Jail officers tased Mr. Partridge while he was fully restrained in

a restraint chair, just as they did Ms. Gotthelf and Mr. Cole.

47.     Boulder County officers have engaged in a persistent custom and practice of

unconstitutional conduct by law enforcement, and the officials responsible for assuring that such

misconduct does not occur have consistently failed to properly train, supervise, and discipline

individual officers who have engaged in such misconduct.

48.     The Boulder County Defendants' failure to find wrongdoing and failure to

discipline officers in this case, and in the cases of Mr. Partridge and Ms. Gotthelf, reflects a

custom, policy or practice of ratifying blatantly illegal and improper conduct. These ratifications

evidence that such police conduct is carried out pursuant to the regimen of training provided by Boulder, and that such conduct is customary within the Boulder County.

49.     It is Boulder County's and Defendant Pelle's responsibility to properly train Boulder County officers to ensure they perform their duties correctly and to discipline, rather than ratify, their improper conduct, so that officers can learn from their mistakes (and the mistakes of their colleagues) and perform their jobs correctly moving forward, and to serve as an example so that other officers will be made aware that the use of excessive force is not acceptable. Boulder County's and Defendant Pelle's failure to do so has led to its officers' unconstitutional conduct and will predicably lead to more unconstitutional conduct in the future.

## STATEMENT OF CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF
### 42 U.S.C. § 1983 – Fourteenth Amendment Violation
### Excessive Force
*Against All Defendants*

50.     Plaintiff incorporates all other paragraphs of this Complaint for purposes of this Claim.

51.     Each of the individually named Defendants was acting under color of state law in their actions and inactions at all times relevant to this Claim.

52.     At the time when Defendants tased Plaintiff, Plaintiff had a clearly established Fourteenth Amendment right, as a pre-trial detainee, to be secure in his person from the use of excessive force.

53.     Any reasonable law enforcement or correctional officer knew or should have known of this clearly established right.

16

54.     Each individually named Defendant engaged in use of force that was objectively unreasonable based on the facts and circumstances confronting them, violating Plaintiff's Fourteenth Amendment rights.

55.     Each individually named Defendant took an active part in the use of force, and no Boulder County Defendant intervened to prevent their fellow officers' use of obviously excessive force.

56.     Defendants Boulder County and Pelle had a duty to train and supervise sheriffs, staff sergeants, captains, and other jail personnel on reasonable use of force against pretrial detainees.

57.     Defendants Boulder County and Pelle failed to discharge this duty, causing the use of excessive force against Plaintiff.

58.     Defendants Boulder County and Pelle acted recklessly, intentionally and with deliberate indifference to the constitutional rights of Plaintiff in failing to adequately train and supervise Defendant sheriffs, staff sergeants, captains, and other jail personnel.

59.     Defendants Boulder County's and Pelle's failure to properly train and supervise his subordinates was the moving force and proximate cause of the violation of Plaintiff's constitutional rights.

60.     Defendants' respective actions and inactions, as described herein, were undertaken intentionally, maliciously, willfully, wantonly, and/or in reckless disregard of Plaintiff's federally protected rights.

61.     The acts and omissions of each Defendant described herein, were the legal and proximate cause of Plaintiff's damages.

62.     The acts and omissions of Defendants were engaged in pursuant to the customs, policies, and practices of Defendants Boulder County and Pelle, which encourage, condone, tolerate, and ratify the use of excessive force by their law enforcement officers.

63.     The acts or omissions of Defendants caused Plaintiff damages in that he suffered severe pain, helplessness, and humiliation, resulting in serious physical and mental injuries and trauma.

**SECOND CLAIM FOR RELIEF**
**42 U.S.C. § 1983 – Fourteenth Amendment Violation**
**Denial of Equal Protection**
*Against Defendant Mecca*

64.     Plaintiff incorporates all other paragraphs of this Complaint for purposes of this Claim.

65.     Each of the individually named Defendants was acting under color of state law in their actions and inactions at all times relevant to this Claim.

66.     At the time when Defendants tased Plaintiff, Plaintiff had a clearly established Fourteenth Amendment right to be free from discriminatory treatment by law enforcement.

67.     Defendant Mecca acted with the purpose of depriving Plaintiff of the equal protection and benefits of the law, and equal privileges and immunities under the law, in violation of the Fourteenth Amendment to the United States Constitution.

68.     Plaintiff is Black.

69.     Plaintiff's race of Black was a motivating factor in Defendant Mecca's decision to tase Plaintiff, as well as in his decision regarding how much force to use.

70.     Defendant Mecca treated Plaintiff less favorably than his similarly situated White counterparts, wholly or in part because Plaintiff is Black.

71.     Defendant Mecca acted with an intent or purpose to discriminate against Plaintiff

18

because he is Black.

72.      There was no rational basis for Defendant Mecca's discriminatory actions, let alone a purpose narrowly tailored to serve a compelling governmental interest.

73.      Defendant Mecca unlawfully used excessive force against Plaintiff, as described herein.

74.      Defendant Mecca subjected or caused Plaintiff to be subjected to the deprivation of individual rights secured by the Fourteenth Amendment.

75.      Defendant Mecca did not act upon a good faith and reasonable belief that his actions against Plaintiff based on racial bias were lawful.

76.      Defendant Mecca' acts or omissions were the moving force behind, and the proximate cause of, injuries sustained by Plaintiff.

77.      Defendant Mecca's actions and inactions, as described herein, were undertaken intentionally, maliciously, willfully, wantonly, and/or in reckless disregard of Plaintiff's rights

78.      Defendant Mecca' acts or omissions caused Plaintiff damages in that he suffered severe pain, helplessness, and humiliation, resulting in serious physical and mental injuries and trauma.

**THIRD CLAIM FOR RELIEF[2]**
**C.R.S. § 13-21-131 – Colo. Const. Art. II, Section 25**
**Excessive Force**
*Against Defendants Pelle, Mitchell, Martinez, Mecca, Domanico,*
*Finkbiner, Howlan, Fundaro, Metcalf, McDaniel, and Long*

79.      Plaintiff incorporates all other paragraphs of this Complaint for purposes of this Claim.

---

[2] Plaintiff brings these claims in good faith for the express purpose of extending and/or modifying existing precedent relating to C.R.S. § 13-21-131.

80. Each of the individually named Defendants was acting under color of state law in their actions and inactions at all times relevant to this Claim.

81. Defendants are "peace officers" under C.R.S. § 24-31-901(3) employed by a local government and therefore subject to C.R.S. § 13-21-131.

82. Plaintiff had a protected Colo. Const. Art. II, Section 25 interest against deprivation of life, liberty, or property without due process of law. By causing excessive force to be used against Plaintiff, Defendants violated Plaintiff's right to substantive due process under the law.

83. Each individually named Defendant engaged in use of force that was objectively unreasonable based on the facts and circumstances confronting them, violating Plaintiff's rights.

84. Each individually named Defendant took an active part in the use of force, and no official intervened to prevent their fellow officers' use of obviously excessive force. Under C.R.S. § 13-21-131(1) an official who fails to intervene is equally liable for the violation of an individual's rights.

85. Defendants Pelle, Mitchell, and Martinez had a duty to train and supervise sheriffs, staff sergeants, captains, and other jail personnel on reasonable use of force against pretrial detainees.

86. Defendants Pelle, Mitchell, and Martinez failed to discharge this duty, causing the use of excessive force against Plaintiff.

87. Defendants Pelle, Mitchell, and Martinez acted recklessly, intentionally and with deliberate indifference to the constitutional rights of Plaintiff in failing to adequately train and supervise Defendant sheriffs, staff sergeants, captains, and other jail personnel.

20

88.     Defendants Pelle, Mitchell, and Martinez's failure to properly train and supervise their subordinates was the moving force and proximate cause of the violation of Plaintiff's constitutional rights.

89.     Defendants' respective actions and inactions, as described herein, were undertaken intentionally, maliciously, willfully, wantonly, and/or in reckless disregard of Plaintiff's rights.

90.     The acts and omissions of each Defendant described herein, were the legal and proximate cause of Plaintiff's damages.

91.     Defendants' acts and omissions were engaged in pursuant to the customs, policies, and practices of Defendants Pelle, Mitchell, and Martinez, who encourage, condone, tolerate, and ratify the use of excessive force by their law enforcement officers.

92.     Defendants' acts or omissions caused Plaintiff damages in that he suffered severe pain, helplessness, and humiliation, resulting in serious physical and mental injuries and trauma.

**FOURTH CLAIM FOR RELIEF[3]**
**C.R.S. § 13-21-131 – Colo. Const. Art. II, Section 20**
**Cruel and Unusual Punishment**
*Against Defendants Pelle, Mitchell, Martinez, Mecca, Domanico,*
*Finkbiner, Howlan, Fundaro, Metcalf, McDaniel, and Long*

93.     Plaintiff incorporates all other paragraphs of this Complaint for purposes of this Claim.

94.     Each of the individually named Defendants was acting under color of state law in their actions and inactions at all times relevant to this Claim.

---

[3] Plaintiff brings these claims in good faith for the express purpose of extending and/or modifying existing precedent relating to C.R.S. § 13-21-131.

95.     Defendants are "peace officers" under C.R.S. § 24-31-901(3) employed by a local government and therefore subject to C.R.S. § 13-21-131.

96.     Plaintiff had a protected Colo. Const. Art. II, Section 20 interest against being subjected to cruel and unusual punishments. By causing excessive force to be used against Plaintiff, Defendants violated Plaintiff's right to be free from cruel and unusual punishment.

97.     Each individually named Defendant engaged in use of force that was objectively unreasonable based on the facts and circumstances confronting them, violating Plaintiff's rights.

98.     Each individually named Defendant took an active part in the use of force, and no official intervened to prevent their fellow officers' use of obviously excessive force. Under C.R.S. § 13-21-131(1) an official who fails to intervene is equally liable for the violation of an individual's rights.

99.     Defendants Pelle, Mitchell, and Martinez had a duty to train and supervise sheriffs, staff sergeants, captains, and other jail personnel on reasonable use of force against pretrial detainees.

100.    Defendants Pelle, Mitchell, and Martinez failed to discharge this duty, causing the use of excessive force against Plaintiff.

101.    Defendants Pelle, Mitchell, and Martinez acted recklessly, intentionally and with deliberate indifference to the constitutional rights of Plaintiff in failing to adequately train and supervise Defendant sheriffs, staff sergeants, captains, and other jail personnel.

102.    Defendants Pelle, Mitchell, and Martinez's failure to properly train and supervise their subordinates was the moving force and proximate cause of the violation of Plaintiff's constitutional rights.

103.    Defendants' respective actions and inactions, as described herein, were undertaken intentionally, maliciously, willfully, wantonly, and/or in reckless disregard of Plaintiff's rights.

104.    The acts and omissions of each Defendant described herein, were the legal and proximate cause of Plaintiff's damages.

105.    Defendants' acts and omissions were engaged in pursuant to the customs, policies, and practices of Defendants Pelle, Mitchell, and Martinez, who encourage, condone, tolerate, and ratify the use of excessive force by their law enforcement officers.

106.    Defendants' acts or omissions caused Plaintiff damages in that he suffered severe pain, helplessness, and humiliation, resulting in serious physical and mental injuries and trauma.

**FIFTH CLAIM FOR RELIEF[4]**
**Colo. Rev. Stat. § 13-21-131 – Violation of Colo. Const. Art. II, Section 25**
**Denial of Equal Protection**
*Against Defendant Mecca*

107.    Plaintiff hereby incorporates all other paragraphs of this Complaint as if fully set forth herein.

108.    Defendant Mecca acted under color of state law and within the course and scope of his employment at all times relevant to the allegations in this Complaint.

109.    At all relevant times, Defendant Mecca was a "peace officer" under Colo. Rev. Stat. § 24-31-901(3) and was employed by a local government.

110.    Plaintiff had a protected interested under Colorado Constitution, Article II, Section 25 to enjoy the equal protection of the laws, including the right to be free from racial discrimination in actions by law enforcement officers.

---

[4] Plaintiff brings these claims in good faith for the express purpose of extending and/or modifying existing precedent relating to C.R.S. § 13-21-131.

111.    Defendant Mecca acted with the purpose of depriving Plaintiff of the equal

protection and benefits of the law, and equal privileges and immunities under the law, in

violation of Colorado Constitution, Article II, Section 25.

112.    Plaintiff is Black.

113.    Plaintiff's race of Black was a motivating factor in Defendant Mecca's decision to

tase Plaintiff, as well as in his decision regarding how much force to use.

114.    Defendant Mecca treated Plaintiff less favorably than his similarly situated White

counterparts, wholly or in part because Plaintiff is Black.

115.    Defendant Mecca acted with an intent or purpose to discriminate against Plaintiff

because he is Black.

116.    There was no rational basis for Defendant Mecca's discriminatory actions, let

alone a purpose narrowly tailored to serve a compelling governmental interest.

117.    Defendant Mecca unlawfully used excessive force against Plaintiff, as described

herein.

118.    Defendant Mecca subjected or caused Plaintiff to be subjected to the deprivation

of individual rights secured by the bill of rights of the Colorado Constitution.

119.    Defendant Mecca did not act upon a good faith and reasonable belief that his

actions against Plaintiff based on racial bias were lawful.

120.    Defendant Mecca's acts or omissions were the moving force behind, and the

proximate cause of, injuries sustained by Plaintiff.

121.    Defendant Mecca's conduct described herein was attended by circumstances of

malice, or willful and wanton conduct, which Defendant Mecca must have realized was

dangerous, or that was done heedlessly and recklessly, without regard to the consequences, or of

the rights and safety of others, particularly Plaintiff.

WHEREFORE, Plaintiff respectfully requests that this Court enter judgment in his favor and against Defendants, and award him all relief as allowed by law and equity, including, but not limited to the following:

a.  Declaratory relief and injunctive relief, as appropriate;

b.  Actual economic damages as established at trial;

c.  Compensatory damages, including, but not limited to those for past and future pecuniary and non-pecuniary losses, emotional pain, suffering, mental anguish, loss of enjoyment of life, medical bills, and other non-pecuniary losses;

d.  Punitive damages for all claims as allowed by law in an amount to be determined at trial;

e.  Pre-judgment and post-judgment interest at the highest lawful rate;

f.  Attorneys' fees and costs; and

g.  Such further relief as justice requires.

**PLAINTIFF DEMANDS A JURY TRIAL ON ALL ISSUES SO TRIABLE.**

DATED this 21st day of September 2022.

KILLMER, LANE & NEWMAN, LLP

*s/ Mari Newman*
_____
Mari Newman
Andy McNulty
1543 Champa Street, Suite 400
Denver, CO 80202
(303) 571-1000
mnewman@kln-law.com
amcnulty@kln-law.com

ATTORNEYS FOR PLAINTIFF